FILED

03/13/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 24, 2023 Session

## STATE OF TENNESSEE v. MICHAEL ROBERT QUINN

**Appeal from the Criminal Court for Knox County**
**No. 117742   Steven Wayne Sword, Judge**

_____

**No. E2022-01661-CCA-R3-CD**

_____

Michael Robert Quinn ("Defendant") appeals from his Knox County Criminal Court convictions for possession with intent to sell or deliver more than .5 grams of methamphetamine within 1,000 feet of a public elementary school, possession of drug paraphernalia, driving on a suspended license, and violation of the financial responsibility law, for which he received a total effective sentence of twenty-five years' incarceration. Defendant contends that: (1) the trial court should have dismissed the presentment based upon the denial of his right to a preliminary hearing; (2) the trial court erred by denying Defendant's motion to suppress evidence obtained from the search of his vehicle; (3) the trial court erred by denying Defendant's motion to suppress evidence obtained from two searches of his cell phone; (4) the failure to make a return on the arrest warrant invalidated the warrant, resulting in a warrantless search and seizure of Defendant in violation of his Fourth Amendment rights; (5) the trial court abused its discretion by denying Defendant's pro se request for a continuance of his trial; (6) the trial court erroneously admitted text messages found on the cell phone in violation of Tennessee Rule of Evidence 404(b); (7) the evidence is insufficient to support his convictions; and (8) the trial court abused its discretion by imposing a sentence of twenty-five years with a one hundred percent release eligibility. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and MATTHEW J. WILSON, JJ., joined.

Joseph A. Sadighian (on appeal) and Cameron D. Bell (at trial), Knoxville, Tennessee, for the appellant, Michael Robert Quinn.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

On November 18, 2019, officers from the Knoxville Police Department (KPD) conducted a traffic stop of a white Chevrolet Silverado truck driven by Defendant. During the traffic stop, officers searched the truck and found a digital scale and a shoebox containing four baggies of methamphetamine. Officers also seized a cell phone used by Defendant that contained text messages concerning attempts to sell methamphetamine.

On July 22, 2020, the Knox County Grand Jury issued a presentment charging Defendant with possession with intent to sell or deliver more than .5 grams of methamphetamine within 1,000 feet of a public elementary school, possession of drug paraphernalia, driving on a suspended license, and violation of the financial responsibility law.[1] Defendant was arraigned on the charges on August 3, 2020, in Knox County Criminal Court. The trial court appointed counsel ("first appointed counsel") and reset the case for October 2, 2020.

*Motion to Withdraw*

On August 13, 2020, first appointed counsel filed a Motion to Withdraw, in which he asserted:

> [Defendant] has sought to file a formal complaint to the Board of Professional Responsibility alleging that Counsel has rendered deficient performance in this case. In order to ensure that [Defendant] receives the effective assistance of counsel, he should be represented by someone in whom he has confidence. For that reason, it is appropriate for new counsel to be appointed.

On December 4, 2020, the trial court held a hearing on first appointed counsel's Motion to Withdraw. First appointed counsel informed the court:

---

[1] The presentment also contained a criminal gang enhancement charge in count 5; however, the State entered a nolle prosequi as to this count prior to trial.

I was appointed to represent [Defendant], who had a pending case in Felony Sessions Court, as well as a revocation matter in Your Honor's court. We had a hearing in the revocation matter, and [Defendant's] probation was revoked, and he was sent to serve his sentence in TDOC.

He had his matters pending in Felony Sessions Court. And we had a number of court dates that we were awaiting a preliminary hearing in Sessions Court. There was a day -- I think July 21 of 2020 we were set for preliminary hearing. [Defendant] was sent back to the facility because there was some unspecified difficulty. . . . [Defendant] . . . was taken to TDOC. The State presented the matters to the Grand Jury.

[Defendant] has complained to the Board, alleging that I had deprived him of his right to a preliminary hearing. I've tried to explain that I did not deprive him of a right to a preliminary hearing through actions of my own, but that he did lose his -- missed his right to a preliminary hearing.

. . . .

My primary concern is that [Defendant], in his complaints to the Board, appears to have lost confidence in my ability to represent him. And I think that [Defendant] is entitled to have an attorney in whom he has confidence and faith, because he has serious charges pending. And I would ask that the Court permit me to withdraw from this representation and appoint substitute counsel.

When the trial court questioned Defendant about first appointed counsel's assertions, Defendant said:

[First appointed counsel] never said nothing to me about anything. Every time I was in court, he never even spoke. I was back there, he was in here, got my court date put off. I just kept explaining to him, you know, how important it is, 'cause it is a serious charge that I have, you know[.]

. . . .

There was no correspondence. I mean, we -- there was no communication. I put in several phone calls. I never got any kind of response back. I never spoke to him one time over the phone.

- 3 -

The trial court asked first appointed counsel if he believed that the relationship with Defendant was "irretrievably severed or broken[,]" and first appointed counsel responded, "I do, Your Honor. Although, I don't agree that we had no communication with one another. I think that we're at a position where [Defendant] needs a new attorney." The court found that the relationship between first appointed counsel and Defendant was irretrievably broken, granted the motion, and appointed new counsel ("trial counsel").

*State's Notice of Impeachment Evidence*

Following the presentment, the State filed a Notice of Intent to Seek Enhanced Punishment and Notice of Impeachment. In its notice, the State listed the following prior convictions:

| Conviction Offense | Classification | Date of Conviction |
|---|---|---|
| Attempted Burglary | Class D Felony | February 18, 2005 |
| Theft | Class D Felony | February 18, 2005 |
| Attempted Sale of Cocaine | Class C Felony | February 18, 2005 |
| Reckless Endangerment | Class E Felony | February 18, 2005 |
| Attempted Burglary | Class D Felony | February 18, 2005 |
| Attempted Burglary | Class D Felony | February 18, 2005 |
| Attempted Burglary | Class D Felony | February 18, 2005 |
| Attempted Burglary | Class D Felony | February 18, 2005 |
| Attempted Burglary | Class D Felony | February 18, 2005 |
| Attempted Burglary | Class D Felony | February 18, 2005 |
| Theft | Class A Misdemeanor | April 4, 2014 |
| Theft | Class A Misdemeanor | April 4, 2014 |
| Theft | Class A Misdemeanor | September 10, 2015 |
| Theft | Class A Misdemeanor | December 1, 2015 |
| Arson | Class C Felony | February 7, 2018 |

During trial, at the close of the State's case-in-chief, the State sought a ruling from the court regarding which prior convictions it would be allowed to use as impeachment evidence should Defendant testify. The State argued that, if Defendant "were to take the stand and ultimately say that . . . these drugs were not his, that the truck was not his, that he did not intend to possess these drugs to resell, his credibility [was] going to automatically come into issue[,]" making Defendant's prior convictions "highly relevant[.]" The State further asserted that any prejudicial effect was substantially outweighed by the probative value of the convictions. In response, trial counsel stated:

Your Honor, I don't know that we have much grounds to object to the
. . . theft-type offenses or the burglary. I -- what I do take issue with is the
attempt to sell cocaine. I believe that that is too similar to what he's charged
with, and I do worry that that would lead the jury to believe that he's just
generally a drug dealer and needs to be found guilty because of that.

The trial court ruled that the State would be allowed to impeach Defendant using
the convictions for attempted burglary and theft, as well as the arson from 2018; however,
the court found that the probative value of Defendant's convictions for attempted sale of
cocaine and reckless endangerment did not outweigh the unfair prejudicial effect on the
substantive issues. The trial court found that Defendant's convictions for attempted
burglary and convictions for theft were "highly probative to the honesty of [D]efendant"
and "would go to his credibility as a witness." The court reasoned, "And should he testify,
then the real issue is going to be whether or not he knew it was there. And that's really the
whole issue in this case." The court agreed that the danger of unfair prejudice was too high
to admit Defendant's conviction for the attempted sale of cocaine. Regarding the
remaining convictions, the court found the reckless endangerment conviction "was outside
the ten years" and did not "fall[] within the statute"; further, the court found that the
conviction was not highly probative. The trial court continued, "The arson, though, was
within the ten years. And so that one's okay. Even though it's not really a crime of
dishonesty, it is a felony offense."

*Motion to Suppress*

On April 30, 2021, Defendant filed a Motion to Suppress all evidence collected by
officers during the search of the white Chevrolet Silverado truck he was driving on
November 18, 2019, and all evidence discovered during the search of two cell phones. At
the hearing on Defendant's Motion to Suppress, KPD Sergeant James Wilson testified that,
on November 18th of 2019, he worked as a drug interdiction officer and assisted KPD
Investigator Philip Jinks in an investigation into Defendant. Sergeant Wilson stated that
he received information from Investigator Jinks that Defendant had an active warrant and
that Defendant was currently at Pleasant Ridge Elementary School. Sergeant Wilson
initiated a traffic stop of the white truck Defendant was driving. Sergeant Wilson
approached the white truck, introduced himself, and obtained Defendant's ID. He
contacted Knox County records and verified that Defendant had an outstanding warrant
"with no bond" for driving on a suspended license. After positively identifying Defendant,
Sergeant Wilson "advised him he had a warrant, had him step out, placed him into custody
and into the backseat of [Sergeant Wilson's] car."

Sergeant Wilson testified that, while Defendant was in the backseat of his patrol car, a K-9 officer arrived and walked his dog around the exterior of the white truck. Sergeant Wilson, who was also a trained K-9 handler, testified that he saw the dog give a "final response," which he said, "comes after the alert to narcotics within the vehicle." The K-9 officer confirmed that the dog alerted to the presence of narcotics in the truck. Sergeant Wilson said that Investigator Jinks then searched the white truck. He identified a copy of the "in-car video" taken from his patrol car of the incident, and it was played for the court. He stated, based on his training and experience as a K-9 handler, that the dog alerted to the odor of narcotics in the truck at 12:05:43 mark of the video.

On cross-examination, Sergeant Wilson said that Investigator Jinks radioed him a description of the truck Defendant was driving. Sergeant Wilson testified that Investigator Jinks gave him "the make and model and the tag" and told him that he watched Defendant "pull out of the parking lot in that vehicle[.]" Investigator Jinks also provided Sergeant Wilson with a photograph of Defendant. Sergeant Wilson said that, while speaking to Defendant, Defendant stated that the truck was registered to someone else but that "it was his truck[.]"

Officer Carl Kennedy testified that he had worked as a K-9 handler with the KPD for approximately nine years. Officer Kennedy detailed his training, explaining that he completed an eight-week basic training course and attended additional training twice a month. Officer Kennedy further explained that he and his K-9, Gunner, had been trained together and that he had worked with Gunner for "a little over six years." Officer Kennedy explained that, as part of his training, he learned how to recognize when Gunner would alert to the presence of narcotics. He stated, "So what we would look for is . . . the noticeable change in behavior is actually the alert. Once the dogs are actually trained to go into a final response and once they get to an odor that they encounter, which is a sit." When asked how he could recognize Gunner's alert to the odor of narcotics, Officer Kennedy said, "Once I see that noticeable change of behavior, whether it's a head kick or something that -- an involuntary change, and then proceeding that, he's taught to actually go into a sit, which is the final response."

Officer Kennedy testified that he assisted Sergeant Wilson and Investigator Jinks during the traffic stop of Defendant. He said that he started Gunner's "exterior sniff" on the longest downwind side of the truck and that, as they passed the driver's side door, Gunner recognized an odor and went into a final response at the door handle of the truck. Officer Kennedy said that Gunner lay down as his final response; based upon his training and experience, Officer Kennedy testified that this indicated Gunner "had come into

contact with the presence of the odor of narcotics." He explained that Gunner was trained to recognize the odor of marijuana, cocaine, methamphetamine, heroin, and MDMA.[2]

On cross-examination, Officer Kennedy testified that Gunner was "above 95 percent" accurate during his training. Officer Kennedy clarified that Gunner's final response was not always "sitting down" and that, in this case, Gunner went into a "full down" response. He stated:

> The final response is not actually what I'm looking for. It's that noticeable change of behavior. When he crossed his -- he actually went up and then was able to cross the door handle. That's where I observed that noticeable head kick and that's when he . . . went into that down position.

Officer Kennedy said that the final response was a trained behavior but that the dog's "noticeable change in behavior" was an involuntary response. He said, "Just like when you . . . walk by and you smell something and kind of look at it."

Jeffrey Skeen testified that he was employed by the Tennessee Department of Correction and that he worked as a court liaison. Mr. Skeen said that, on November 18, 2019, Defendant was on probation for an arson conviction out of Knox County Criminal Court. He identified a Probation Order signed by Defendant and explained, "This is what [probationers] sign when they're going over the rules during intake with them when they're placed on probation." Mr. Skeen then read Rule 7 from Defendant's Probation Order, which said, "I agree to search without warrant of my person, vehicle, property or place of residence by a probation, parole officer or law enforcement officer at any time."

Investigator Jinks testified that, on November 13, 2019, he was working as a narcotics investigator with the KPD when he received information from an administrator at Pleasant Ridge Elementary School "indicating some suspicious behavior by [Defendant] and a student at the school." The school administrator identified Defendant by name. Investigator Jinks met with the administrator at the school the following day and reviewed surveillance video that showed Defendant's arriving at the school driving a white Chevrolet pickup truck. He stated that Defendant signed in to visit a child at the school and that Defendant left the school in the same white truck. Investigator Jinks testified that the video showed Defendant's turning from the public roadway into the school's parking lot. Thereafter, Investigator Jinks checked Defendant's criminal history and the status of his driver's license; he found that Defendant had an extensive criminal history and that his

---

[2] 3,4-Methylenedioxymethamphetamine, abbreviated as MDMA, is a stimulant and hallucinogen commonly known as Ecstasy or Molly.

license was suspended. He further learned that Defendant was on probation; he spoke to Defendant's probation officer and confirmed that Defendant's property was subject to search as a condition of his probation.

Investigator Jinks stated that, on Friday November 15, 2019, he received another call indicating that Defendant had been back to the school that day. He said that, at 9:54 a.m. on Monday November 18, 2019, he obtained a warrant for Defendant's arrest for driving on a suspended license. Investigator Jinks testified that he had received a phone call from the school administrator that afternoon, "advising that [Defendant] had returned to the school." Investigator Jinks then contacted Sergeant Wilson and provided him with a physical description of Defendant's truck and Defendant and sent him a photograph of Defendant and a still from the video of Defendant's truck.

Investigator Jinks testified that he went to Pleasant Ridge Elementary School and located the white Chevrolet pickup truck that he believed Defendant to be driving parked in the school's parking lot. He said that he watched Defendant walk out of the school talking on his cell phone; Defendant got into the driver's side of the white truck and drove out of the parking lot and onto Pleasant Ridge Road. Investigator Jinks then radioed Sergeant Wilson and asked him to conduct a traffic stop on the truck.

Investigator Jinks stated that he called for a K-9 officer at the initiation of the traffic stop and that Officer Kennedy responded. Once the K-9 alerted, Investigator Jinks conducted a search of the truck. Inside the cab of the truck, he found a shoebox containing four individual baggies of what appeared to be methamphetamine; he also discovered a digital scale. Investigator Jinks testified that the approximate field weight of the suspected methamphetamine was "about 20 to 23 grams." He also located two cell phones inside the truck, one of which was the cell phone he saw Defendant talking on while walking out of the school. He said that, based upon the conditions of Defendant's Probation Order, he "conducted a limited search of the contents of the cell phone [he] saw [Defendant] talking on when he exited the school." He testified, "I did see some communications in that phone that would indicate [Defendant] was involved in the distribution of methamphetamine." He said that, based upon the totality of the circumstances, he charged Defendant with possession of methamphetamine for resale. Investigator Jinks testified that, the following day, he applied for and obtained a search warrant "to do a complete and thorough extraction of the information from the phone that [Defendant] was seen talking on," as well as the other cell phone found inside the truck. Investigator Jinks identified a copy of the affidavit, search warrant, and search warrant return, which was made an exhibit to his testimony.

On cross-examination, Investigator Jinks stated that he began investigating Defendant based upon the suspicious interaction between Defendant and the student at the

elementary school as relayed to Investigator Jinks by the school administrator. When asked to elaborate, Investigator Jinks testified:

> [The school administrator] advised that [Defendant] had come to visit a juvenile female student at the elementary school. He was listed on the card as being able to pick the child up and visit the child, come eat lunch with the child, things like that, but . . . when they went and got the child . . . she became very upset. She . . . began crying, even to the point of urinating on herself.
>
> They were concerned. There [was] some other information that the mother of the child had come to the school with noticeable injuries to her face. They were afraid for the safety of the child.

At the conclusion of the hearing, the trial court took the matter under advisement and later issued a written order denying the Motion to Suppress on June 8, 2021. In its order, the trial court found that officers had a warrant for Defendant's arrest prior to the stop of his truck; thus, the initial seizure of Defendant was not warrantless. The court further found that the officers had probable cause to believe that Defendant was currently driving on a suspended license, which provided officers with a second valid basis for the stop.

Regarding the search of Defendant's truck, the trial court found that the K-9 alerted during an open-air search, giving officers probable cause to believe that the truck contained illegal narcotics. Furthermore, the court found that Investigator Jinks knew Defendant was on probation, that Defendant signed a probation order agreeing that he submit to a search of his person, vehicle, property, or place of residence by any probation or law enforcement officer at any time without a warrant. Thus, the court concluded that Investigator Jinks' warrantless search of the truck was justified based upon probable cause from the K-9 search and based upon the rules of Defendant's probation.

Regarding the search of Defendant's cell phone, the trial court found that Defendant had previously consented to a search of his "property" as a condition of his probation and that Defendant was on probation at the time of Investigator Jinks' initial search of the cell phone. The court found that Investigator Jinks witnessed Defendant's using the cell phone as Defendant left the school, and thus, he had reason to believe the cell phone was Defendant's property and was subject to a warrantless search. The trial court also found that, on November 19, 2019, Investigator Jinks obtained a search warrant for the cell phones found inside the truck and that "[n]o mention of the initial warrantless search was made in the affidavit to the search warrant." The court determined that "the affidavit

provided probable cause to search the cell phones completely independent of any information the affiant may have observed during the first warrantless search. Therefore, the information obtained as a result of the search warrant would not be the fruit of the poisonous tree."

*Pro Se Request for Continuance*

Defendant's case went to trial on November 15, 2021. Prior to the start of jury selection, the following exchange occurred:

> THE COURT: [Trial counsel], you got preliminary matters, sir?
>
> [TRIAL COUNSEL]: Yes, Your Honor. [Defendant] indicated that he wanted to address the Court.
>
> THE COURT: All right, [Defendant]. What do you say, sir?
>
> [DEFENDANT]: I'd just like to get a continuance, 'cause me and my lawyer has not had proper time to get our defense together. I've only had one sit-down meeting with him, and that was last night.
>
> THE COURT: All right. What's going on, [trial counsel]?
>
> [TRIAL COUNSEL]: That's not quite true. I believe we've had three in-person meetings. And I know we met once via video. Your Honor, I --
>
> [DEFENDANT]: That was just -- that was just for the suppression hearing only. Like . . . there was no other communication about a trial. I didn't even know this was a trial day.
>
> THE COURT: Well, I don't know about that. We've had lots of discussions about the trial date.
>
> Do you believe you're ready, [trial counsel]?
>
> [TRIAL COUNSEL]: Yes, Your Honor.
>
> THE COURT: All right. Yeah. So I understand you'd like more time, [Defendant], but I know [trial counsel's] been working on this case. He took it over from [first appointed counsel]. He's been working on it diligently.

- 10 -

That doesn't necessarily mean that you've been there while he's been working on it. But[,] I am going to deny your request for a continuance, and we're going to proceed to trial.

*Trial Testimony*

Sergeant Wilson testified that, on November 18, 2019, he was working as part of the department's Drug Interdiction Unit. Sergeant Wilson identified a photograph of a white truck that was driven by Defendant on that day. He began his observation of Defendant while Defendant was driving on Pleasant Ridge Road. He got behind Defendant on Pleasant Ridge Road driving towards Merchants Drive. He identified a video from his patrol car showing his driving behind Defendant; he noted Investigator Philip Jinks pulling into the Dollar General parking lot.

Sergeant Wilson initiated a traffic stop of the white truck; he introduced himself to Defendant and asked for Defendant's identification and proof of insurance. Defendant gave Sergeant Wilson his ID but was unable to provide proof of insurance. Sergeant Wilson testified that he was aware Defendant's driver's license was suspended at the time of the stop and that there was an outstanding warrant for Defendant's arrest for driving on a suspended license from a different day. After confirming Defendant's identity, Sergeant Wilson asked him to step out of the white truck, and he took Defendant into custody; he conducted a pat-down search of Defendant and placed Defendant in the back of his patrol car. Sergeant Wilson testified that he asked Defendant if he owned the white truck. Defendant said that "it was registered to his aunt" but that it was his truck and he "had a bill of sale for that truck to be his." Sergeant Wilson verified that the truck was registered in someone else's name.

Sergeant Wilson stated that, while Defendant was in the back of his patrol car, a K-9 officer responded to the scene. He explained that he had prior experience as a K-9 handler from 2010 until 2017. He said that he had attended two K-9 handler schools, consisting of "240 hours apiece." He stated that he also attended monthly training "twice a month for at least eight hours a day." Recalling the day of Defendant's traffic stop, Sergeant Wilson explained that Officer Kennedy and the K-9, Gunner, were present. Sergeant Wilson said that he had previously worked with Gunner. While the video from Sergeant Wilson's patrol car was played for the jury, Sergeant Wilson explained Gunner's movements around the white truck. He said that it was part of the K-9 training that "you start with the wind blowing in their face so that if there is the odor of narcotics within a vehicle . . . they'll work their way into it and it will hit them in the face." When asked about how Gunner alerted to narcotics in a vehicle, Sergeant Wilson stated:

- 11 -

His specific change in behavior, I couldn't tell you what it was on this one. I can tell you that final response that we train at the Knoxville Police Department is a sit response. So all the dogs are trained that -- the absolute last thing they do before they get their toy or their reward, if you will, is that they will sit down.

Viewing the video of the search from his patrol car, Sergeant Wilson identified Gunner's "final response" and then Officer Kennedy's throwing a ball against the truck for Gunner.

Sergeant Wilson said that, after Gunner alerted for the presence of narcotics, Investigator Jinks searched the white truck driven by Defendant. He said that he first observed Defendant in the white truck driving in front of Pleasant Ridge Elementary School. Sergeant Wilson testified that the elementary school was in session that day.

Investigator Jinks testified that he had worked for the KPD for twenty-three years and that he was primarily tasked with investigating narcotic sales and drug cases. After detailing his prior training and experience, Investigator Jinks was recognized as an expert in narcotics investigations. Investigator Jinks testified that, on November 18, 2019, he was in the parking lot of Pleasant Ridge Elementary School when he saw Defendant exit the front door of the school. He stated, "And [Defendant] was talking on his cell phone. And I watched him walk through the parking lot and get into the driver's seat of a 1992 Chevrolet pickup truck, white in color[.]" Investigator Jinks testified that he knew Defendant had an outstanding warrant for his arrest and that Defendant's driver's license was suspended. Investigator Jinks said that he pulled out of the parking lot behind Defendant and obtained the tag number on the truck; he then radioed the information to Sergeant Wilson, who was "sitting down the street[,]" and asked Sergeant Wilson to conduct a traffic stop based on the outstanding warrant and his knowledge of the status of Defendant's driver's license.

Investigator Jinks testified that he observed Defendant exiting the school around 11:30 a.m. He explained that Pleasant Ridge Elementary School was in session at the time and that there were children present. Investigator Jinks testified that, on November 13, 2019, he saw Defendant driving the same white truck. Regarding his movements after Defendant exited the elementary school, Investigator Jinks said:

I pulled out onto Walnoaks Drive in front of [Defendant], before [Defendant] pulled out, and was relaying our location to [Sergeant] Wilson. And I turned onto Pleasant Ridge Road. [Defendant] turned behind me. And then I turned into the Dollar General on Pleasant Ridge to allow [Defendant] to go by and [Sergeant] Wilson to go by so the traffic stop can be conducted. And then I

- 12 -

turned around in the parking lot there and came in behind them.

Investigator Jinks testified that he searched the white truck after the traffic stop. Regarding the interior of the truck, Investigator Jinks explained, "It didn't have four doors, but it had an extra space behind the driver's seat and passenger seat, kind of a storage space, before the rear windshield and the bed of the truck began." He said that, in the storage space, he found several boxes and bags of clothes. Inside a Nike shoebox, he found four plastic bags that contained what Investigator Jinks "immediately recognized as methamphetamine." Investigator Jinks also found a digital scale in the storage space of the truck. He said that, in the front of the truck, he found two cell phones. He identified the "working cell phone" as an LG Android cell phone and said that he saw Defendant using the cell phone when Defendant walked out of the elementary school. He said that the second cell phone found inside the truck was "an old Apple iPhone" that had a dead battery.

Investigator Jinks stated that he was in the parking lot of the elementary school for ten to fifteen minutes observing the white truck before Defendant exited the school. He said that Defendant's truck was parked in the elementary school's parking lot and that Defendant was the truck's only occupant. Investigator Jinks testified, based on his training and experience, that digital scales were frequently used to "weigh controlled substances before they're packaged, primarily for distribution." He continued:

> It is common . . . for those who are involved in the distribution of controlled substances, to weigh certain amounts, both when they purchase it and before they sell it, to ensure that the weight requested is the weight that's being distributed so that they're not shorting their customer or giving them too much and losing money. So that's a . . . very common thing.

Investigator Jinks said that he submitted the Nike shoebox and the digital scales for fingerprint examination. He said that the digital scale was near the Nike shoebox containing the methamphetamine. He also said that he later submitted the four baggies of methamphetamine to the Tennessee Bureau of Investigation (TBI) crime laboratory for chemical analysis. Regarding the four baggies of methamphetamine he found inside the Nike shoebox, Investigator Jinks stated there were two larger bags, which were referred to as "corner baggies," and two smaller bags known as "stamp bags." Investigator Jinks explained that drug dealers commonly packaged controlled substances in sandwich bags for distribution.

Investigator Jinks testified that the approximate field weight of the controlled substance found in the white truck was a little over twenty-two grams, which he said was

- 13 -

six grams short of an ounce. He stated that a typical user of methamphetamine "would purchase a much smaller amount for personal use than this [twenty-two] grams of field weight methamphetamine that was seized in this case." Investigator Jinks explained that he conducted a field test on the material inside the baggies and that it tested positive for methamphetamine, which he stated was a Schedule II controlled substance. Investigator Jinks said that he found $210 during Defendant's arrest, but he could not recall if the money was found in the white truck or on Defendant.

Investigator Jinks testified that, based upon his experience, he knew that "if you're engaged in the business of selling controlled substances, you're going to have text messages, most likely, in your phone about selling controlled substances." Investigator Jinks explained that he was trained in the use of Cellbrite software, which the police department utilized in the extraction and analysis of cell phone data. He said that, as part of his investigation in this case, he performed an extraction of the LG cell phone found in the white truck and successfully obtained the incoming and outgoing text messages from the cell phone.

At this point, the trial court held a jury-out hearing on the issue of the admission of the text messages found on the LG cell phone. After the State's proffer of a series of text message exchanges concerning Defendant's attempts to sell methamphetamine, the trial court stated:

I agree it's 404(b) material. The [c]ourt has conducted a jury-out hearing. The [c]ourt does find proof of the prior offenses by clear and convincing evidence.

. . . .

The question becomes, is there a material issue other than conduct conforming with a character trait? . . . But there is . . . [a] proper material issue here, I believe, and that is intent. [D]efendant's intent, under 42.10, says, the [c]ourt can admit it and the jury can consider it if it shows the defendant's intent. And that is, such evidence may be considered by you if it tends to establish the defendant actually intended to commit the crime for which he is presently charged.

All of these messages are within a week of the stop. . . . And so I think it's very strong evidence to show that the drugs that were in the vehicle were possessed with intent to sell or deliver.

- 14 -

. . . .

The [c]ourt also finds that the probative value's extremely high in this matter, and that any danger of unfair prejudice is outweighed by that probative value. So I'm going to allow the State to bring them in.

Following the jury-out hearing, Investigator Jinks identified a report of the text messages dated November 13, 2019, between Defendant and a contact named "Aunt Caryn," that were extracted from the LG cell phone. He stated that there was an outgoing message from Defendant's cell phone to "Aunt Caryn" that said, "I got sum clear I'm trying 2 sale." He explained, based upon his training and experience, that "clear" was a common term used to refer to "ice methamphetamine." He stated:

> [I]ce methamphetamine -- which this methamphetamine would be considered ice -- it looks like glass or clear shards of ice. So folks that are engaged in this lifestyle will commonly refer to as -- just as clear. That's one of the . . . very common slang terms used to refer to methamphetamine.

Investigator Jinks testified that the next outgoing message from Defendant's cell phone read, "Tell Vern 50 a gram." He explained that the message reflected Defendant's quoting $50 for a gram of methamphetamine. He said that, if Defendant had been selling the methamphetamine for $50 a gram, then the twenty-two grams found in Defendant's white truck would have been worth around $1,000.

Investigator Jinks next identified a text message exchange that occurred on November 15, 2019, between Defendant and a contact named "J Goins." He said that an outgoing message from Defendant's cell phone to "J Goins" asked, "Can u get rid of some clear 4 me?" The following colloquy then occurred:

> Q. And the incoming says, "If it's any good I can."

> A. And the response to that . . . says, "It is good." And excuse my language, but reading from the messages, it says, "It is good and I'll f**k with u I'm tryin to get a place 2 live."

> Q. And then it's -- incoming says, "Ok I text you around 4 i will take some."

. . . .

- 15 -

A.  Message 29 is an outgoing message.

Q.  And what is the message?

A.  It was at 2:16 p.m.  And it says, "Ok how much u want?"

Q.  And so jumping up to message 26, is that an incoming or outgoing message?

A.  It is an incoming message to [D]efendant's phone from J Goins.

Q.  And the message saying, "What you sell a G for?"

A.  Yes.

Q.  What is the response to that message, "What you sell a g for?"

A.  It says, "50."

Q.  Okay.  And is that going to be in the -- what would you -- based on your training and experience, what do you believe a "G" to be?

A.  A gram.

Q.  So is that the same as we heard earlier, the 50 a gram?

A.  Yes.  The same price that was quoted to Vern earlier is being quoted to this J Goins, $50 a gram.

Investigator Jinks said that an incoming text message to Defendant's cell phone asked about the price for a "teener."  Investigator Jinks said that a "teener" or "teenager" referred to "a 16th of an ounce, which would be about one and a half grams, essentially. Maybe a little more than one and a half grams."  He testified that the next outgoing message from Defendant's cell phone read, "70," which was followed by an incoming message that stated, "Ok hook me up with a teener."  Investigator Jinks read the next outgoing message from Defendant's cell phone that stated, "U got 80 I'll just do 2 gs [they are] already made up."  Investigator Jinks testified, "'U got 80 I'll just do 2 Gs' is asking the person, if you got $80, I'll do two grams for $80; '[they are] already made up,' which means they're already bagged up and ready to go.  So they've been prepackaged in gram quantities and they're ready to go."  He explained that the text messages found on Defendant's cell phone,

"coupled with the amount and the packaging of the controlled substance and the possession of the digital scale," led him to believe that Defendant possessed the methamphetamine in the truck for resale.

Investigator Jinks identified another extraction report showing text messages between Defendant's cell phone and an unnamed contact in Defendant's cell phone. He stated that the messages were exchanged between November 16, 2019, at 5:45 p.m., and November 17, 2019, at 12:01 a.m. The following colloquy occurred regarding these messages:

A. . . . This is an incoming message that says, "Who's this?"

Q. And the outgoing, meaning from [D]efendant's phone, says, "Who are u?"

A. Correct. Outgoing from [D]efendant's phone is, "Who are u?"

Q. Okay. And then the incoming message . . . saying "Jenny"?

A. Yes. There's an incoming message then that says, "Jenny."

Q. And the next incoming says, "Who is this?" also from that same phone?

A. Yes. "Who is this?" that's the next incoming message. And then there's an outgoing message that says, "Jenny M."

Q. And the incoming, is that in response to the next outgoing?

A. Yes. It's just 10 seconds later or so. It says, "Ya."

Q. As in, yes, this is Jenny M?

A. Yes.

. . . .

Q. Skipping up to message 18 . . . at the top of page 2 is that an outgoing or incoming?

- 17 -

A. It is an outgoing message from [Defendant's] phone.

Q. And what is that message?

A. It says, "I got some deals if u can help."

Q. And based on your training and experience in narcotics investigation, what is the significance of "deals"?

A. Well, it would be drug deals. But as this conversation continues and taken in context with other text messages, I believe that's [Defendant] saying -- asking for help selling some methamphetamine.

Q. And . . . the incoming message . . . in response to that message we just discussed, what is that message?

A. It says, "What's up?"

. . . .

A. The outgoing message responding to "What's up?" says, "Clear?" with a question mark.

Q. And you stated that was an outgoing message?

A. Yes, that was an outgoing message.

Investigator Jinks explained that this outgoing message was sent from Defendant's cell phone two days prior to his arrest. He said that the cell phone extraction reports were from the same cell phone that he saw Defendant talking on immediately prior to his arrest.

Investigator Jinks next identified an extraction report showing text messages between Defendant's cell phone and a contact listed as "Taylor" in Defendant's cell phone. He said that an outgoing message from Defendant's cell phone to Taylor read, "I got sum deals on that clear if u can move it." Investigator Jinks averred that "deals on clear" meant that Defendant had "methamphetamine for sale." He said that an incoming message from Taylor then asked "[h]ow much" for a "qt." Investigator Jinks testified that, "[t]aken in context with the rest of the thread and the prices that are mentioned, that's referring to a quarter ounce or a little over seven grams of methamphetamine." He said that the next outgoing message from Defendant's cell phone read, "200[,]" which he said was

Defendant's quoting Taylor $200 for a quarter ounce of methamphetamine. Investigator Jinks explained that an incoming message from Taylor stated, "I'm getting it for $140[.]" Two outgoing messages from Defendant's cell phone then read, "Is it good?" and "I'll do like 170 this time cuz this s**t fire if you wanna f**k wit it." Investigator Jinks testified that the term "fire" was commonly used when referring to the potency or quality of a controlled substance. He said, "So a fire controlled substance would be really, really good, really . . . high potency, very strong substance[.]" He stated that the text message exchange with Taylor took place on November 17, 2019, the day before Defendant was arrested.

Investigator Jinks identified a final extraction report that showed text messages between Defendant's cell phone and a contact listed in Defendant's cell phone as "Stephanie." He said that the messages were exchanged between November 15, 2019, and November 17, 2019. The following colloquy occurred regarding the text messages:

> A. The first message is an outgoing message. It was on November 15th at 11:50 a.m. And it just says, "What u doin?"
>
> . . . .
>
> A. . . . And the next message is an incoming that says, "Laying in the hospital."
>
> Q. And the next message?
>
> A. The next message is the next day. So it's on November 16[,] 2019. It is an outgoing message that says, "You ok?"
>
> Q. And the next message?
>
> A. The next message, which . . . isn't received until almost 24 hours later. So this was November 17[,] 2019, at 10:53 a.m., just says, "Not really."
>
> . . . .
>
> A. The final message sent to Stephanie was November 17[,] 2019, at 11:03 a.m.
>
> Q. And what is the message?
>
> A. It says, "I need to get this clear off."

Q. Again, what is -- based on your training and experience, what is clear?

A. "Clear" is methamphetamine. And "need to get it off" is need to sell it, get rid of it.

Investigator Jinks testified that Defendant's truck containing the methamphetamine was on the real property of an elementary school when it was parked in Pleasant Ridge Elementary School's parking lot. He said that, after the substance found in the Nike shoebox field-tested positive for methamphetamine, he sent the substance to the TBI's crime laboratory for additional testing.

On cross-examination, Investigator Jinks was asked why he believed the white truck driven by Defendant the day of his arrest belonged to Defendant, and Investigator Jinks responded:

Well, throughout the arrest process and speaking with [D]efendant, he kept referring to it as his truck. He was driving it. He was the only person driving it. He was the only person in it. He had the keys to it. And some of the statements [D]efendant made was that some of the items in the truck were his and that it was his truck.

He acknowledged that Defendant said some of the items in the truck belonged to someone else. He further acknowledged that the truck was registered to Defendant's aunt but stated that Defendant "was in the process of obtaining or buying the truck."

Investigator Jinks testified that he was "very close" to Defendant when Defendant walked out of the elementary school; he said, "When he exited the school, he was probably 50 yards away, maybe not that far, maybe a little shorter than that. But he was approaching me as he got into his truck." Investigator Jinks recalled that he was parked only two parking spaces away from Defendant's truck. Investigator Jinks stated that he was able to see the case of the cell phone Defendant was using while walking to the truck and that it was the case on the LG cell phone seized from the truck.

Investigator Jinks said that, although several items seized were dusted for prints, no useable fingerprints were recovered. When asked whether he had any basis to believe that Defendant was using the seized LG cell phone in the days leading up to his arrest, Investigator Jinks testified, "There were other messages in the phone that identified [Defendant] as using the phone, where he would provide his address and things of that nature, in the content of the phone." The following exchange then took place:

Q. Did you find any empty bags in the car?

A. Not that I recall, no, sir.

Q. Okay. So if someone had intended to sell any of the meth that was in the car, there wouldn't have been any of the normal packaging materials?

A. Well, two of the packages were the smaller stamp bags, which would indicate to me that smaller amounts had been taken out of the larger bags and placed into those stamp bags for distribution, which is consistent with prior text messages, as well, about the two already made up.

Investigator Jinks testified that it was not "completely unheard of that a user would weigh the substance during the buying process" but said that it was unusual because it could be considered "offensive to the person who's selling it."

On redirect examination, Investigator Jinks said that he had seen Defendant driving the white truck prior to November 18, 2019, and that there had been no one in the truck with Defendant. He said that the LG cell phone seized from the white truck was locked when it was found and that Defendant provided him with the passcode to unlock it.

TBI Special Agent Ashley Cummings testified that she worked as a forensic chemist in the crime laboratory's drug identification unit. Agent Cummings stated that she analyzed the crystalline substance identified by Investigator Jinks as having been found in a Nike shoebox inside Defendant's truck. She said that her testing of the substance showed that it contained methamphetamine and that the weight of the substance she tested was 7.89 grams. Agent Cummings explained, "That's the total weight of the one that was analyzed fully. There were, I believe, three additional bags of crystalline substance that was visually consistent with the one that was tested." The following exchange then took place:

Q. [So] there were additional substances, I guess, brought to you that you didn't analyze?

A. Yes. There were three more bags of crystalline substance in this case, as well. But if it's not going to get to another penalty enhancement, as far as the weight is concerned, we just take a -- make a note of the weight of the rest of that and put it on the report as a gross weight.

Q. Okay. And so, then, what would have been the weight of the part that you didn't actually analyze?

- 21 -

A. The gross weight of what I did not analyze was 13.03 grams.

Q. So approximately 20 grams total of everything?

A. Yes.

At the close of the State's case-in-chief, the parties entered the following stipulation: "The parties hereby stipulate that on November 18[,] 2019, [D]efendant's driver's license was revoked and/or suspended, according to the Tennessee Department of Safety."

Defendant recalled Investigator Jinks, who testified that the field weight of the methamphetamine was approximately twenty-two grams. Investigator Jinks said that this was a "fairly large amount of methamphetamine" and "certainly far more than a personal-use amount." He admitted, however, that it would not be an impossible amount for a methamphetamine user to consume over the course of a month.

On cross-examination, Investigator Jinks was shown a report that he prepared following Defendant's arrest. He testified the report contained a statement made by Defendant to Sergeant Wilson during the search of the truck, in which Defendant said that "all of the [Nike Air] Jordan boxes were his."

Following deliberations, the jury found Defendant guilty of possession with intent to sell or deliver more than .5 grams of methamphetamine within 1,000 feet of a public elementary school, possession of drug paraphernalia, driving on a suspended license, and violation of the financial responsibility law.

*Sentencing*

At a sentencing hearing held March 4, 2022, the State introduced a copy of Defendant's Presentence Investigation Report and certified copies of Defendant's prior judgments of conviction; no additional proof was submitted. The trial court then heard arguments from the parties regarding the appropriate sentence and took a recess to consider the matter.

In announcing Defendant's sentence, the trial court stated that it had reviewed the court's file, the court's notes from the trial, the Presentence Investigation Report, and the State's Notice of Intent to Seek Enhanced Punishment, and the parties' arguments concerning mitigating and enhancement factors. The court also allowed Defendant to make a statement of allocution, in which Defendant said that he would "like not to spend the rest of [his] life in prison" and noted that he had children.

The court found beyond a reasonable doubt that Defendant was a Range II offender, noting that the parties agreed this was the appropriate offender classification. The court explained that Defendant's conviction for possession with intent to sell or deliver over .5 grams of methamphetamine in a Drug-Free Zone was a Class A felony with a sentencing range of twenty-five to forty years. The trial court then stated:

At the time this offense was committed, the law stated that the minimum sentence of the range of the particular defendant had to be served with no release eligibility date, what we call 100-percent sentence. So that means the first 25 years have to be served at 100-percent sentencing rate.

Now, that law has changed since this act was committed by [D]efendant. And it is now discretionary to the [trial court] on whether or not it would have to be 100 percent. So we didn't have any argument about the Saving[s] Statute. I'm not sure it applies in these cases. I think it does regarding percentage. . . . And, also, whether or not, if it's 100 percent, the law now says, . . . notwithstanding any other law or the sentence imposed by the [c]ourt to the contrary, a defendant sentenced for a violation of subsection B may be required to serve at least the minimum sentence for the defendant's appropriate range of sentence.

There is a rebuttable presumption that a defendant is not required to serve at least the minimum sentence for the defendant's appropriate range. The rebuttal presumption is overcome if the [c]ourt finds the defendant's conduct exposed vulnerable persons to the distractions and dangers that are incident to the occurrence of illegal drug activity.

. . . .

So I do think that the Saving[s] Statute would incorporate that portion of the new statute. And so I've really wrestled with this. Twenty-five years is a long time to serve on a drug-related offense. And I think the Legislature was wise in amending the law on these drug-free . . . zones.

The problem I've got in this case is, this is not my typical drug-free . . . zone. The typical drug-free . . . zone we have is a defendant is selling drugs out of his apartment, which happens to be 1,000 feet from a school. This was, actually, the defendant going on the school property with drugs in his vehicle. It's only one step down from somebody actually selling drugs on school property to the kids. The way this investigation began was the

- 23 -

principal called Investigator Jinks, who then began monitoring [D]efendant['s] coming on the property.  So even though there's no evidence that [D]efendant was actually conducting drug sales on the school property, the [c]ourt does find that [D]efendant's behavior exposed normal persons, being the kids, to the distractions and dangers that are incident to the occurrence of illegal drug activity.  This was not a one-time event that he was on there.  [Investigator] Jinks had seen him there.  The principal had seen him there.  And when he got caught, sure enough, he had had the drugs on him.  Therefore, I think, even under the Saving[s] Statute, the 100-percent sentencing rate does apply, in this case should apply.

Additionally, the trial court found that Defendant had a previous history of criminal convictions, in addition to those necessary to establish the appropriate range; the court noted that Defendant had nine prior felony convictions in addition to those necessary to establish his range and that his convictions went "all the way back to when he was a juvenile."  The court found that Defendant was an offender whose record of criminal activity was extensive.  The trial court also determined that, at the time he committed the felony offense, Defendant was released on probation for a 2018 arson conviction.

Based on these findings, the trial court concluded that the rebuttal presumption was overcome by the State and sentenced Defendant, as a Range II offender, to twenty-five years with a one hundred percent release eligibility for possession with intent to sell or deliver over .5 grams of methamphetamine in a Drug-Free Zone.  Additionally, the court sentenced Defendant to eleven months and twenty-nine days for possession of drug paraphernalia; six months for driving on a suspended license; and thirty days for violation of the financial responsibility law.  The court ordered all counts to run concurrently, for a total effective sentence of twenty-five years to serve with a one hundred percent release eligibility.

At the conclusion of the hearing, trial counsel made an oral motion to be relieved as counsel.  After hearing proof and arguments of counsel, the court granted the motion and appointed new counsel ("appellate counsel") to represent Defendant.

*Motion for New Trial*

Defendant filed a timely Motion for New Trial and Amended Motion for New Trial. At a hearing, Defendant called Brittany Shockley, who testified that she and Defendant were friends and that he was one of the people allowed to visit her daughter, E.W.[3], at

---

[3] It is the policy of this court to identify minor witnesses by their initials only.

Pleasant Ridge Elementary School. Ms. Shockley stated that, in November 2019, she occasionally asked Defendant to have lunch with E.W. at school to "make her feel better." She explained that E.W.'s father had recently passed away and that E.W.'s "was having a hard time at school and stuff, so having people go have lunch with her would make her feel better[.]" She said that she asked Defendant to visit E.W.'s at the elementary school on November 13, 2019, and November 18, 2019. On cross-examination, Ms. Shockley agreed that, on November 18, 2019, E.W. was at school and school was in session.

Tonya Turpin testified that she was Ms. Shockley's mother and E.W.'s grandmother. She said that she was at the elementary school to pick up E.W.'s brother on the day of Defendant's arrest and that she brought in fast food and gave it to Defendant for E.W. to eat at lunch.

E.W. testified that Defendant was "like a father figure" to her. She said that she had never been afraid of Defendant. She recalled a day when her brother left school early; she said that she was upset that day and that Defendant came to visit her for lunch.

Following the hearing, the trial court denied the Motion for New Trial and Amended Motion for New Trial in a written order. This timely appeal follows.

## II. Analysis

### A. Lack of a Preliminary Hearing

Defendant contends that because he was denied his right to a preliminary hearing in General Sessions Court, the presentment against him should have been dismissed. Defendant asserts that he did not fail to appear for his preliminary hearing or otherwise waive his right to one and that he wanted first appointed counsel to enforce his right to a preliminary hearing. He contends that, when first appointed counsel filed the Motion to Withdraw, the trial court failed to timely hear the motion, and he claims that, by failing to hear the motion, the trial court constructively denied Defendant his right to counsel at a time when he could have pursued his remedy for failure of the State to afford him a preliminary hearing under Tennessee Rule of Criminal Procedure 5. The State responds that Defendant's challenge to the lack of a preliminary hearing is time-barred. The State does not address the merits of the claim that Defendant was constructively denied the right to counsel at a critical stage of the proceedings based upon the trial court's failure to timely hear the Motion to Withdraw.

- 25 -

## 1. Rule 5 of the Tennessee Rules of Criminal Procedure

Generally, "[a]ny defendant arrested or served with a criminal summons prior to indictment or presentment for a misdemeanor or felony, except small offenses, is entitled to a preliminary hearing." Tenn. R. Crim. P. 5(f)(1). This right may be waived under certain circumstances, such as when the defendant fails to appear for a scheduled preliminary hearing for reasons not outside his control. Tenn. R. Crim. P. 5(f)(1)-(2). If an indictment or presentment is returned against a defendant who has not waived his right to a preliminary hearing, the criminal court "shall dismiss the indictment or presentment on motion of the defendant filed not more than thirty days from the arraignment on the indictment or presentment." Tenn. R. Crim. P. 5(f)(4).

In this case, Defendant failed to raise a timely claim that the presentment should have been dismissed because he was denied his right to a preliminary hearing, as required by Tennessee Rule of Criminal Procedure 5(f)(4). Thus, Defendant's claim under Rule 5 of the Tennessee Rules of Criminal Procedure is time-barred. We note additionally that it is unclear from the record whether Defendant waived his right to the preliminary hearing by failing to appear. *See* Tenn. R. Crim. P. 5(f)(2) (stating that a defendant "waives the right to a preliminary hearing by failing to appear for a scheduled preliminary hearing, unless the defendant presents before the general sessions court, and the court finds within fourteen days after the scheduled preliminary hearing, clear and convincing evidence that the failure to appear was beyond the defendant's control"). First appointed counsel stated at the Motion to Withdraw hearing that, on the day of Defendant's scheduled preliminary hearing, Defendant "was sent back to the facility" due to "some unspecified difficulty." Although appellate counsel claimed during the Motion for New Trial hearing that Defendant was not at fault, statements of counsel are not evidence. *State v. Thompson*, 832 S.W.2d 577, 589 (Tenn. Crim. App. 1991). On this record, there is no "clear and convincing evidence that the failure to appear was beyond the defendant's control." Tenn. R. Crim. P. 5(f)(2).

## 2. Constructive Denial of Counsel

Defendant also argues that he was constructively denied his Sixth Amendment right to counsel based upon the trial court's failure to timely hear first appointed counsel's Motion to Withdraw. The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI. A defendant has the right to counsel at all "'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.'" *Maine v.*

*Moulton*, 474 U.S. 159, 170 (1985) (quoting *United States v. Wade*, 388 U.S. 218, 224 (1967)).

The United States Supreme Court has long held that "the [Sixth Amendment] right to counsel attaches only at or after the initiation of adversary proceedings against the defendant . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972)). In Tennessee, an arrest warrant, or a preliminary hearing if no arrest warrant is issued, or an indictment or presentment, when the charge is initiated by the grand jury, marks the initiation of criminal charges to which the Sixth Amendment right to counsel attaches. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980).

Once the right to counsel has attached, the "actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland v. Washington*, 466 U.S. 668, 692 (1984). Also, "various kinds of state interference with counsel's assistance" are always deemed prejudicial. *Id*. When there has been no actual or constructive denial of counsel, however, a complaining defendant must demonstrate prejudice. *Id*. at 693-96; *United States v. Cronic*, 466 U.S. 648, 659 n. 25-26 (1984). Defense counsel's actual conflict of interest will result in the constructive denial of counsel and prejudice will be presumed in such cases where the actual conflict of interest adversely affected the lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 350, (1980); *see, e.g., State v. Frye*, No. E2019-00686-CCA-R3-CD, 2021 WL 1971982, at *25 (Tenn. Crim. App. May 17, 2021) ("Prejudice will only be presumed in those cases where the defendant has established that trial counsel actively represented conflicting interests' and that an actual conflict of interest adversely affected the lawyer's performance." (cleaned up and quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984))), *perm. app. denied* (Tenn. Sept. 22, 2021). In *Herring v. New York*, the Supreme Court of the United States held that the defendant was denied the right to counsel when the trial court refused to allow defense counsel to make a closing argument. 422 U.S. 853, 858 (1975). The Court has also held that the right to counsel is violated when defense counsel is denied the opportunity for effective cross-examination. *See Davis v. Alaska*, 415 U.S. 308 (1974). Further, the Court has held that a trial court's order preventing the defendant from conferring with his attorney during an overnight recess resulted in the denial of counsel. *See United States v. Geders*, 425 U.S. 80 (1976).

In this case, Defendant has not shown that he was constructively denied the right to counsel based upon the trial court's failure to timely hear first appointed counsel's Motion to Withdraw. There is no proof in the record as to the cause of the delay in hearing the

Motion to Withdraw and no proof that the delay denied Defendant the opportunity to file a motion to dismiss the presentment under Tennessee Rule of Criminal Procedure 5(f)(4).

Additionally, the record does not establish an actual conflict of interest existed between trial counsel and Defendant. *See Thompson*, 768 S.W.2d at 243. We note that a defense attorney is not automatically required to withdraw from a case after a client files a formal complaint against the attorney with the Board of Professional Responsibility (the "Board"). *See State v. Hodge*, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503, at *5 (Tenn. Crim. App. Aug. 26, 2011) (holding trial counsel was not ineffective in failing to withdraw after petitioner wrote a letter to the Board and multiple letters to the trial court complaining about counsel's representation prior to trial), *perm. app. denied* (Tenn. Feb. 15, 2012); *Lewis v. State*, No. W1998-00793-CCA-R3-PC, 2001 WL 55635, at *4 (Tenn. Crim. App. Jan. 23, 2001) (concluding that trial counsel's performance was not constitutionally deficient when counsel failed to request to withdraw after the defendant filed a complaint against counsel with the Board); *see also State v. Higgs*, No. W2000-02588-CCA-MR3-CD, 2002 WL 1841697, at *3 (Tenn. Crim. App. Aug. 5, 2002) (holding that, although the defendant had filed three complaints against trial counsel with the Board at the time of trial, the defendant had "not provided this [c]ourt with sufficient information to determine that there existed a conflict of interest requiring defense counsel's withdrawal"). As noted in *Hodge*, "Any rule that would essentially permit a defendant to automatically discharge his appointed counsel simply by raising written complaints would inevitably become the subject of delaying tactics and abuse." 2011 WL 3793503, at *5.

Defendant has not shown that he was constructively denied his Sixth Amendment right to counsel based upon the trial court's delay in hearing first appointed counsel's Motion to Withdraw. He is not entitled to relief on this claim.

### B. Search of Defendant's Truck

Defendant argues that officers lacked probable cause to search his truck based on Officer Kennedy's testimony that his K-9, Gunner, alerted to the presence of narcotics in the truck. He maintains that the trial court erred by finding Gunner reliable based upon his performance and by finding that Officer Kennedy's testimony established a positive alert. He argues that Sergeant Wilson's testimony established that Gunner's "alert" was an "involuntary response and not a trained response" and that Gunner's "final response[] could vary from a sit to laying down." He asserts that Gunner's "change of behavior was not consistent with his training but was a subjective determination made by Sergeant Wilson[.]" The State responds that the K-9's positive alert established probable cause to search Defendant's truck.

The applicable standard of review for suppression issues is well-established. A trial court's findings of fact are binding on this court unless the evidence in the record preponderates against them. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing and all reasonable and legitimate inferences that may be drawn therefrom. *Id*. The trial court's application of law to the facts is reviewed under a de novo standard with no presumption of correctness. *Id*. (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). When reviewing a trial court's ruling on a motion to suppress, this court may consider the entire record, including the proof presented at the suppression hearing as well as at trial. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005); *Walton*, 41 S.W.3d at 81; *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998). "Findings of fact made by the trial judge after an evidentiary hearing of a motion to suppress are afforded the weight of a jury verdict, and this court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against his findings." *State v. Adams*, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992).

Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). "The 'automobile exception' to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband." *State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009); *see Carroll v. United States*, 267 U.S. 132, 149 (1925).

A positive reaction to a vehicle by a trained drug detection canine provides probable cause to search inside a vehicle, provided that evidence establishes the dog's reliability in detecting narcotics. *See State v. England*, 19 S.W.3d 762, 768-69 (Tenn. 2000). Reliability often turns on questions around the canine's training, conduct of the handler during the search, and the dog's track record for accurately detecting narcotics. *Id*. at 768 (citing *United States v. $80,760.00 In U.S. Currency*, 781 F. Supp. 462, 478 (N.D. Tex. 1991), for the proposition that "[r]eliability problems arise when the dog receives poor training, has an inconsistent record, searches for narcotics in conditions without reliability controls or receives cues from its handler"); *see also State v. Bowden*, No. M2016-02525-CCA-R3-CD, 2018 WL 2149731, at *6 (Tenn. Crim. App. May 10, 2018) (stating that determining a dog's reliability "includes consideration of the dog's training, the officer's training and experience with the dog, and the record of false negative and false positive alerts").

In this case, the trial court found that Gunner was "a reliable K-9 based upon training and performance" and that the dog's positive alert provided probable cause for the search of Defendant's truck, and the evidence does not preponderate against the trial court's factual findings. At the Motion to Suppress hearing, Officer Kennedy testified that he had worked as a K-9 handler for approximately nine years. Officer Kennedy detailed his training, explaining that he completed an eight-week basic training course and attended additional training twice a month. Officer Kennedy further explained that he and his K-9, Gunner, had been trained together and that he had worked with Gunner for "a little over six years." Regarding the sweep of Defendant's truck, Officer Kennedy testified that, as they passed the driver's side door, Gunner recognized an odor, gave a "head kick," and then went into a final response at the door handle of the truck. Officer Kennedy said that, based upon his training and experience, this indicated that Gunner "had come into contact with the presence of the odor of narcotics."

Defendant claims that Gunner's change in behavior "was not consistent with his training" and merely reflected the "subjective determination" of his handler, Officer Kennedy. However, Officer Kennedy stated that, as part of his training, he learned how to recognize when Gunner would alert to the presence of narcotics. He testified that Gunner often alerted with a "head kick," which was the same alert he saw from Gunner when the dog approached the driver's side door handle of Defendant's truck. Officer Kennedy also explained that Gunner was trained to sit as a final response. He said that, even though Gunner lay down on this occasion, the dog's final response could vary depending on how the dog was oriented to the vehicle. Thus, the evidence does not preponderate against the trial court's factual finding that Gunner was reliable.

In any event, as an alternative basis for upholding the search of the truck, the trial court found that Defendant was on probation at the time of the traffic stop and that he had consented to warrantless searches of his vehicle at any time as a condition of his probation. In Tennessee, a probation order that "permit[s] a search, without warrant, of a probationer's person, vehicle, property, or place of residence by any Probation/Parole Officer or law enforcement officer, at any time, do[es] not require law enforcement to have reasonable suspicion." *State v. Hamm*, 589 S.W.3d 765, 777 (Tenn. 2019). The record reflects that, on February 20, 2018, Defendant signed a probation order in which he agreed to a search of his person, vehicle, property, or place of residence by any probation or law officer. During the traffic stop, Defendant told Sergeant Wilson that the truck was his and that he had the bill of sale for the truck. Investigator Jinks knew that Defendant was on probation, and he reasonably relied on Defendant's representations that the truck was his when conducting the warrantless search. *See id.*

Under these facts, we conclude that the trial court properly found that the search of the truck was lawful because the K-9's alert established probable cause and because Defendant consented to the warrantless search as a condition of probation. Defendant is not entitled to relief.

## C. Search of Defendant's Cell Phone

Defendant argues that the evidence obtained from both searches of the LG cell phone should have been suppressed by the trial court. He contends that Investigator Jinks was "prompted" to obtain a search warrant by what he observed during the warrantless search of the cell phone and that the search warrant was, therefore, invalid. Defendant also contends that the trial court erred by finding the police could search the LG cell phone based on Rule 7 of the Probation Order he signed. Defendant acknowledges the ruling in *Hamm* but, nonetheless, "advances the arguments Justice Clark and Justice Lee made in their dissents in *Hamm*." He argues that, if the law changes, the search of the LG cell phone was not supported by reasonable suspicion. The State responds that the trial court properly denied the Motion to Suppress with respect to the evidence obtained from the search of Defendant's cell phone.

In denying the Motion to Suppress, the trial court found that Defendant had previously consented to a search of his property as a condition of his probation and that Defendant was on probation at the time of Investigator Jinks' initial search of the cell phone. The court found that Investigator Jinks witnessed Defendant's using the cell phone as Defendant left the school, and thus, he had reason to believe the cell phone was Defendant's property and was subject to a warrantless search. The trial court also found that Investigator Jinks later obtained a search warrant for the cell phone, that "[n]o mention of the initial warrantless search was made in the affidavit to the search warrant."

The evidence does not preponderate against the trial court's findings of fact, *see Echols*, 382 S.W.3d at 277, and this court is bound by the precedent set forth by the Tennessee Supreme Court in *Hamm*. Under *Hamm*, Defendant's probation search condition was lawful, the officers knew of the Defendant's probationary status prior to the search, and they conducted the search pursuant to a valid law enforcement concern. Therefore, the officers did not need reasonable suspicion to conduct a warrantless search of his cell phone. 589 S.W.3d at 777. Accordingly, the trial court properly denied the Motion to Suppress, and Defendant is not entitled to relief on this claim.

- 31 -

## D. Lack of Officer's Return on the Arrest Warrant

Next, Defendant asserts that the failure to make a return on his arrest warrant violated Tennessee Rule of Criminal Procedure 4(e)(4)(A) and invalidated the warrant. He contends that, "without a valid arrest warrant," the stop and seizure of Defendant by Sergeant Wilson and the search of his vehicle and person by Investigator Jinks violated his right to be free from unreasonable search and seizure under the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. The State responds that the incomplete arrest warrant return does not affect the validity of the searches or seizures in this case.

Initially, we note that Defendant did not include this issue in his Motion to Suppress and raised it for the first time in his Motion for New Trial. This court has previously stated, "[A] party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634-635 (Tenn. Crim. App. 1994); *see State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) (holding that an appellant cannot object on one ground and assert a new basis on appeal); *see also State v. Smith*, No. E2007-00084-CCA-R3-CD, 2009 WL 230696, at *21 (Tenn. Crim. App. Feb. 2, 2009), *perm. app. denied* (Tenn. Aug. 17, 2009). When that happens, the party waives the issue. *See Adkisson*, 899 S.W.2d at 635; *State v. Matthews*, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990); *Aucoin*, 756 S.W.2d at 715.

However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642. In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Defendant has failed to establish he is entitled to plain error relief. The requirements for the return of an arrest warrant are prescribed by Tennessee Rule of Criminal Procedure 4(e)(4)(A), which states:

> The officer executing a warrant shall return it to the magistrate or clerk or other officer before whom the defendant is brought pursuant to Rule 5. On or before the return day, the person to whom a criminal summons is delivered for service shall make a return to the magistrate or clerk before whom the summons is returnable.

In his brief, Defendant concedes that "the return of an officer upon a search warrant is a ministerial function and does not affect the validity of the warrant and its execution by the officer." *State v. Hilliard*, 906 S.W.2d 466, 468 (Tenn. Crim. App. 1995). Nevertheless, Defendant argues that the failure to complete the return on his arrest warrant should be treated differently, but he fails to cite any authority for this position. Moreover, as noted by the State, federal case law undermines Defendant's position. *See, e.g.*, *United States v. Williams*, No.1:17-CR-00117-MRB, 2018 WL 4856536, at *8 (S.D. Ohio Oct. 5, 2018) (concluding that the return of an arrest warrant was ministerial and that "any failure therein does not void the warrant") (citing *United States v. Moore*, 452 F.2d 569, 573 (6th Cir. 1971)). Because Defendant has not established that a clear and unequivocal rule of law was breached, Defendant is not entitled to plain error relief.

### E. Pro Se Motion to Continue Trial

Defendant contends that the trial court abused its discretion by denying his pro se motion for a continuance on the morning of trial. Defendant asserts that he "legitimately lacked trust" in trial counsel and knew that trial counsel "was not ready for trial." He contends that the trial court should have questioned trial counsel "concerning the preparation he made for trial" and should have questioned Defendant further "regarding his concerns, whether he had any witnesses he wanted called and if they were present, and whether he had reviewed the material provided by the State in discovery." Defendant maintains that, had the trial court investigated his concerns further, the court would have granted a continuance or removed trial counsel from the case. Finally, Defendant contends that the trial court's denial of his request for a continuance constituted a denial of his right to counsel. The State responds that the trial court did not abuse its discretion because Defendant had no right to make the pro se motion while represented by counsel.

"The trial court's denial of a continuance will be reversed only if it appears that the trial court abused its discretion to the prejudice of the defendant." *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). In this context, "[a]n abuse of discretion requires a showing

that the denial of a continuance denied the defendant a fair trial or that the result of the trial would have been different." *Id*. "Moreover, a defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice." *Id*. "Eleventh hour motions for continuances are not favored by any trial courts, since they are often ploys to prevent having a trial." *State v. Joiner*, No. 02C01-9204-CR-00093, 1993 WL 424802, at *4 (Tenn. Crim. App. Oct. 20, 1993).

Here, the trial court acted within its discretion in denying Defendant's pro se request for a continuance made on the morning of trial. Upon questioning by the court, trial counsel confirmed that he was prepared for trial and stated that he had met with Defendant several times. Moreover, based upon the record before this court, there is no showing of actual prejudice resulting from the denial of Defendant's last-minute motion for continuance. *See Odom*, 137 S.W.3d at 589. Additionally, as noted by the State, "a defendant in a criminal case may not proceed pro se while simultaneously being represented by counsel." *State v. Davis*, 141 S.W.3d 600, 615 n.12 (Tenn. 2004); *see State v. Muse*, 637 S.W.2d 468, 470 (Tenn. Crim. App. 1982). Because Defendant was represented by trial counsel, he had no right to make a pro se motion for a continuance. For all these reasons, the trial court did not abuse its discretion, and Defendant is not entitled to relief.

## F. Admission of Text Messages

Defendant argues that the trial court erred by admitting, under Tennessee Rule of Evidence 404(b), the text messages from the LG cell phone. Defendant argues that the evidence failed to prove his possession of the methamphetamine on November 18, 2019, was a "continuation of the activity suggested by the text messages on the proceeding days. Thus, although the text messages may have had some probative value on the issue of [Defendant's] intent, their overall effect was to cause the jury to believe he had a propensity to commit the charged crime." The State responds that the trial court properly admitted the text messages showing Defendant's intent to sell or deliver methamphetamine.

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). "Rule 404(b) is often viewed as a rule of exclusion, but several panels of this court have noted that 'it may equally be viewed as a rule of inclusion, if the prior bad acts or crimes of the accused are admissible for purposes other than to prove character.'" *State v. Woods*, No. W2016-01527-CCA-R3-CD, 2018 WL 1674210, at *9 (Tenn. Crim. App. Apr. 6, 2018) (citations omitted), *perm. app. denied* (Tenn. Aug, 9, 2018). "Other purposes" have been defined to include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. *See State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004).

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if the trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. *DuBose*, 953 S.W.2d at 652.

Here, the trial court complied with the procedural requirements of Rule 404(b). It held a hearing outside the presence of the jury, found that the State proved the other acts by clear and convincing evidence, and determined that the evidence was relevant to the issue of Defendant's intent. The court concluded that the probative value of the evidence outweighed any prejudice to Defendant. Thus, we will review the trial court's decision for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652); *Baker*, 785 S.W.2d at 134.

The trial court did not abuse its discretion in admitting the text messages found on the LG cell phone. The court reasonably concluded that the text messages were highly probative of Defendant's intent to sell or deliver as they all occurred within a week of the

- 35 -

traffic stop. Indeed, Investigator Jinks testified that, in several text messages, Defendant discussed the sale of methamphetamine the day before the traffic stop. We agree with the State that, "[c]oupled with the amount and packaging of methamphetamine in his truck, the probative value of these messages outweighed any risk of unfair prejudice." Defendant is not entitled to relief on this basis.

## G. Sufficiency of the Evidence

Defendant asserts that the jury's verdict finding him guilty of possession with intent to sell or deliver more than .5 grams of methamphetamine within 1,000 feet of a public elementary school and possession of drug paraphernalia was against the weight of the evidence, citing Tennessee Rule of Criminal Procedure 33(d). Defendant contends the State failed to prove his ownership of the truck he was operating or that he had exclusive possession of the truck, that the State failed to establish that he knowingly possessed the methamphetamine, and that no forensic evidence tied him to the methamphetamine or drug paraphernalia. The State responds that the evidence is sufficient to support Defendant's convictions.

Rule 33(d) of the Tennessee Rules of Criminal Procedure states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule is the modern equivalent of the "thirteenth juror rule" and requires the trial court to weigh the evidence and grant a new trial "if the evidence preponderates against the weight of the verdict." *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). Our supreme court has stated that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[] and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). When a trial judge overrules a motion for new trial, absent any evidence that the trial court expressed dissatisfaction or disagreement with the weight of the evidence or the verdict, this court presumes that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id*. Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the sufficiency of the evidence. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

In this case, the trial court fulfilled its role as thirteenth juror, and thus, our review is limited to the sufficiency of the evidence. Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

(emphasis in original); *see also* Tenn. R. App. P. 13(e).  Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh the evidence.  *Id*.  Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence."  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt.  *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The defendant bears the burden of proving why the evidence was insufficient to support the conviction.  *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914.  On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom."  *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

### 1. Possession with Intent to Sell or Deliver a Controlled Substance

It is an offense to knowingly possess a controlled substance with the intent to sell or deliver the controlled substance.  Tenn. Code Ann. § 39-17-417(a)(4) (2019).  A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist."  Tenn. Code Ann. § 39-11-302(b).  Methamphetamine is a Schedule II controlled substance.  Tenn. Code Ann. § 39-17-408(d)(2) (2019).  A violation of Tennessee Code Annotated section 39-17-417 "may be punished one (1) classification higher than is provided in § 39-17-417(b)-(i)" if the violation occurs on the grounds of any school.  Tenn. Code Ann. § 39-17-432(b)(1)(A) (2019).

A conviction for possession of a controlled substance with intent to sell or deliver may be had upon either actual or constructive possession.  *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001).  When a person "knowingly has direct physical control over a thing, at a given time, [that person] is then in actual possession of it."  *State v. Edmondson*, 231 S.W.3d 925, 928 (Tenn. 2007) (quoting Black's Law Dictionary 1163 (6th ed. 1990)).  "While actual possession refers to physical control over an item, constructive possession requires only that a defendant have 'the power and intention . . . to exercise dominion and control over' the item allegedly possessed."  *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014) (quoting *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013)) (omission in original); *see also State v. Hart*, 676 S.W.3d 103, 108 (Tenn. Crim. App. 2023).  However, "the mere presence of a person in an area where drugs are discovered is not, alone, sufficient."  *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000) (citing *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987)).  "Likewise, mere association with

a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs." *Cooper*, 736 S.W.2d at 129.

Proof of intent to sell or deliver usually consists of circumstantial evidence and the inferences that can be reasonably drawn from that evidence. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983) (observing that a jury may derive a defendant's intent from both direct and circumstantial evidence). The jury may infer "from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing" in violation of § 39-17-417(a). Tenn. Code Ann. § 39-17-419 (2019).

When viewed in the light most favorable to the State, the evidence presented at trial shows that Defendant knowingly possessed a controlled substance with the intent to sell or deliver the controlled substance and that this possession occurred on the grounds of an elementary school. First, the proof showed that Defendant was in constructive possession of methamphetamine while on the grounds of Pleasant Ridge Elementary School. Investigator Jinks observed Defendant walk out of the elementary school and get into a white truck that was parked in the school's parking lot. Investigator Jinks followed Defendant as he left the school grounds and requested that Sergeant Wilson conduct a traffic stop of the truck. Defendant was the only occupant of the truck, and he admitted that the truck was his. During a subsequent search of the truck, Investigator Jinks found methamphetamine in a Nike shoebox in the cab in a storage area directly behind where Defendant was seated, and Defendant acknowledged that the Nike shoebox was his. Additionally, Investigator Jinks testified that text messages found on the LG cell phone used by Defendant related to Defendant's attempts to sell methamphetamine in the days leading up to the traffic stop and that the way in which the methamphetamine was packaged was consistent with the text messages found on the cell phone. From this evidence, a jury could reasonably infer that, at the time of the traffic stop, Defendant knew methamphetamine was inside the cab of the truck in the Nike shoebox and that Defendant had the power and intention to exercise dominion and control over it.

The State also presented evidence from which a jury could reasonably infer that Defendant intended to sell or deliver the methamphetamine. Again, the text messages found on the cell phone used by Defendant showed that Defendant was attempting to sell methamphetamine prior to his arrest. Investigator Jinks also testified that the approximate field weight of the methamphetamine was a little over twenty-two grams and that a typical user of methamphetamine "would purchase a much smaller amount for personal use[.]" In addition to the methamphetamine, Investigator Jinks located a digital scale near the Nike

shoebox during the search of the truck, and he testified, based on his training and experience, that digital scales were frequently used to "weigh controlled substances before they're packaged, primarily for distribution." He also testified that drug sellers typically packaged drugs for resale in plastic sandwich baggies and that the methamphetamine in the Nike shoebox was packaged in plastic baggies. Based upon the text messages, digital scale, plastic baggies, and relatively large amount of methamphetamine possessed by Defendant, the jury could reasonably conclude that Defendant knowingly possessed methamphetamine with the intent to sell or deliver, *see, e.g.*, *State v. Ross*, 49 S.W.3d 833, 845 (Tenn. 2001), and that the offense occurred on the grounds of a school. Tenn. Code Ann. § 39-17-432(b)(1)(A).

### 2. Possession of Drug Paraphernalia

A conviction for possession of drug paraphernalia, under Tennessee Code Annotated section 39-17-425(a)(1), requires the State to prove three elements beyond a reasonable doubt: (1) that the defendant possessed an object; (2) that the object possessed was classifiable as drug paraphernalia; and (3) that the defendant intended to use that object for at least one of the illicit purposes enumerated in the statute. *See State v. Mallard*, 40 S.W.3d 473, 486 (Tenn. 2001) (listing elements to be proven under section 39-17-425(a)(1)). Possession may be constructive as well as actual. *Shaw*, 37 S.W.3d at 903.

When viewed in the light most favorable to the State, the evidence also establishes that Defendant possessed, with intent to use, drug paraphernalia to pack or repack a controlled substance. While searching the cab of Defendant's truck, Investigator Jinks located a digital scale near the Nike shoebox that contained the methamphetamine in a storage area just behind Defendant's seat. Investigator Jinks testified, based on his training and experience, that digital scales were frequently used to "weigh controlled substances before they're packaged, primarily for distribution." Investigator Jinks further testified that two of the plastic baggies found inside the Nike shoebox were "smaller stamp bags, which would indicate . . . that smaller amounts had been taken out of the larger bags and placed into those stamp bags for distribution" and were consistent with text messages found on Defendant's cell phone concerning his attempts to sell the methamphetamine. Based upon these facts, the evidence is sufficient to sustain Defendant's conviction for possession of drug paraphernalia. He is not entitled to relief.

### H. Sentencing

Defendant contends that the trial court erred by imposing a sentence of twenty-five years with a one hundred percent release eligibility. Defendant argues that his actions did not expose "vulnerable persons to the distractions and dangers that are incident to the

occurrence of illegal drug activity," and therefore, the trial court should not have imposed a sentence with a one hundred percent release eligibility. The State responds that the trial court correctly imposed the mandatory minimum sentence despite misapplying the Criminal Savings Statute.

Defendant was convicted under the Drug-Free Zone Act. The stated purpose of the Drug-Free Zone Act is to provide "all students in this State an environment in which they can learn without the distractions and dangers that are incident to the occurrence of drug activity in or around school facilities." 1995 Tennessee Laws Pub. Ch. 515 (H.B. 298). In an effort to accomplish this purpose, the Drug-Free Zone Act imposed two mandatory punishments to enhance the sentence of a defendant who committed a drug offense within 1,000 feet of a public or private elementary school, middle school, or secondary school. The first punishment required a defendant to be sentenced "one (1) classification higher than is provided in Tennessee Code Annotated section 39-17-417(b)-(i) for such violation." Tenn. Code Ann. § 39-17-432(b)(1) (2019). The second required a defendant to serve "at least the minimum sentence for the defendant's appropriate range of sentence." Tenn. Code Ann. § 39-17-432(c) (2019). A defendant was not eligible for "any sentence reduction credits" and was not eligible for release prior to full service of such minimum sentence. *Id*.; *see also Davis v. State*, 313 S.W.3d 751, 764 (Tenn. 2010) (stating that "defendants dealing drugs in school zones who are sentenced to the minimum term in their sentencing range will serve literally 100% of their sentences").

In 2020, the General Assembly amended the Drug-Free Zone Act by reducing the distance used to determine a drug-free zone from 1,000 feet to 500 feet and by giving trial courts discretion in imposing the one classification higher punishment for school properties. 2020 Tennessee Laws Pub. Ch. 803, § 2 (S.B. 2734) (eff. Sept. 1, 2020). Under the 2020 amendments, minimum sentences were no longer mandatory, and instead, there was a "rebuttable presumption that a defendant [was] not required to serve at least the minimum sentence for the defendant's appropriate range of sentence." Tenn. Code Ann. § 39-17-432(c)(2) (2020). The rebuttable presumption could be overcome if the trial court found "that the defendant's conduct exposed vulnerable persons to the distractions and dangers that are incident to the occurrence of illegal drug activity." *Id*.

In sentencing Defendant, the court found that the Criminal Savings Statute applied, requiring retroactive application of the 2020 amendments to the Drug-Free Zone Act. Whether the Criminal Savings Statute requires retroactive application of a sentencing statute is a question of law, which this court reviews de novo. *State v. Deberry*, 651 S.W.3d 918, 924 (Tenn. 2022). The Criminal Savings Statute generally requires trial courts to sentence a criminal defendant according to the law "in effect at the time of the commission of the offense." Tenn. Code Ann. § 39-11-112 (2019). But if an amended sentencing

statute "provides for a lesser penalty," and the sentencing hearing has not yet been held, the new law controls. *Id.*; *see, e.g., State v. Moore*, No. W2021-01352-CCA-R3-CD, 2022 WL 4299574, at *8 (Tenn. Crim. App. Sept. 19, 2022) ("Tennessee Code Annotated section 39-11-112, the savings statute, applies to reduce the punishment for theft offenses committed prior to the change in the law when sentencing takes place after the law has gone into effect." (citing *State v. Menke*, 590 S.W.3d 455, 468, 469 n.12 (Tenn. 2019); Tenn. Code Ann. § 39-11-112)), *no perm. app. filed*. A sentencing court "must apply those background principles absent a 'clear showing' that the legislature has deviated from them." *Deberry*, 651 S.W.3d at 930 (citation omitted).

This court has repeatedly held that the Criminal Savings Statute does not require retroactive application of the 2020 amendments to the Drug-Free Zone Act. *State v. Cody*, No. E2022-00947-CCA-R3-CD, 2023 WL 9006670, at *23 (Tenn. Crim. App. Dec. 28, 2023) ("This court has repeatedly rejected the argument that the Savings Statute requires retroactive application of the 2020 amendments to the Drug-Free Zone Act." (citing cases)), *no perm. app. filed*; *State v. Hamlin*, No. E2022-00139-CCA-R3-CD, 2023 WL 177105, at *5 (Tenn. Crim. App. Jan. 10, 2023) (compiling cases), *perm. app. denied* (Tenn. May 10, 2023). The public act's enabling provision states, "This act shall take effect September 1, 2020, the public welfare requiring it, and applies to offenses committed on or after that date." 2020 Tenn. Pub. Acts ch. 803, § 12. This "specific statutory enabling provision" supersedes the default rule established by the lesser-penalty provision of the Criminal Savings Statute. *See Hamlin*, 2023 WL 177105, at *5 (citing *State v. Cauthern*, 967 S.W.2d 726, 735 (Tenn. 1998)).

Defendant committed the instant offense on November 18, 2019, before the effective date of the 2020 amendments to the Drug-Free Zone Act. Because the Criminal Savings Statute does not require retroactive application of the 2020 amendment, the trial court should have applied the version of the law in effect at the time of the offense. *Hamlin*, 2023 WL 177105, at *5. Although the trial court erred in this respect, it nevertheless imposed the mandatory minimum sentence required by the version of the law in effect at the time of the offense based upon its finding that Defendant exposed vulnerable people—children in elementary school—to the dangers and distractions incident to illegal drug activity. Because the trial court imposed the required mandatory minimum sentence of twenty-five years with a one hundred percent release eligibility, *see* Tenn. Code Ann. §§ 39-17-417(c)(1), 39-17-423(b)(1), 40-35-112(b)(1) (2019), the error is harmless, and there is no need for resentencing. Defendant is not entitled to relief.

## III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE